STATE OF NORTH CAROLINA v. JOSEPH DWAYNE MORROW, Defendant

No. COA08-867

(Filed 6 October 2009)

**1. Constitutional Law— *ex post facto*—satellite-based monitoring (SBM)—new requirement**

Mandatory (SBM) of a defendant convicted of indecent liberties did not violate the *ex post facto* clause of the United States Constitution where the requirement did not exist when the offense was committed. Issues regarding implementation of the SBM policy were not raised by either party.

**2. Constitutional Law— void for vagueness—not raised at trial**

A void for vagueness argument not raised at trial was dismissed on appeal.

**3. Sexual Offenders— satellite-based monitoring (SBM)—notice of hearing**

An argument concerning the lack of notice of SBM was not addressed where defendant received timely notice of the SBM hearing and was represented by counsel at the hearing.

**4. Sexual Offenders— satellite-based monitoring (SBM)—notice of criteria**

An argument concerning the absence of notice to a sex offender of the criteria for SBM was dismissed where defendant did not seek to refute the State's evidence or to offer any other evidence. However, the types of evidence that might be presented by the Department of Correction (DOC) may be gained through reference to the statutes and DOC guidelines.

**5. Sexual Offenders— satellite-based monitoring (SBM)—determined by trial court**

A Department of Correction (DOC) rating of high risk is not a necessary prerequisite to SBM under N.C.G.S. § 14-208.40B(c); the trial court is not limited by DOC's risk assessment and may hear any admissible evidence relevant to the risk presented by defendant. In this case, there was evidence from a probation revocation hearing immediately preceding the SBM hearing that defendant had failed to attend sexual abuse treatment sessions. The matter was remanded for additional evidentiary proceedings and more thorough findings.

## 6. Sexual Offenders— satellite-based monitoring (SBM)— definite time

A case involving the SBM of a sex offender was remanded for the trial court to set a definite time for the monitoring.

Judge ELMORE concurring in part and dissenting in part.

Appeal by defendant from order entered on 19 February 2008 by Judge Henry E. Frye, Jr. in Superior Court, Wilkes County. Heard in the Court of Appeals 11 February 2009.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General Peter A. Regulski, for the State.*

*Mark Montgomery, for defendant-appellant.*

STROUD, Judge.

Defendant was ordered to enroll in satellite-based monitoring ("SBM") for seven to ten years pursuant to his 16 November 2006 no contest plea to indecent liberties with a child. Defendant presents three issues for this Court's review: (1) whether requiring SBM enrollment on the basis of crimes committed before enactment of the SBM statutory scheme violates the *Ex Post Facto* Clause of the United States Constitution, (2) whether the procedure for determining SBM enrollment violates the Due Process Clause of the United States Constitution, and (3) if the SBM statutory scheme is otherwise constitutionally sound on its face, whether the trial court's findings of fact supported its legal conclusion that defendant must be enrolled in SBM for seven to ten years. For the following reasons, we conclude defendant's constitutional claims are without merit, but remand for additional findings of fact.

## I. Background

On 16 November 2006, defendant pled no contest to two counts of indecent liberties with a child. He was sentenced to 18 to 22 months on each count. The two sentences were suspended and defendant was placed on 36 months supervised probation. As a condition of his probation, defendant was required, *inter alia*, to "enroll in [a] sex offender control program, receive psychological treatment for depression, substance abuse, and specific sex offender treatment includig [sic] treatment outside Wilkes County."

On 20 December 2007, defendant's probation officer filed a probation violation report in Superior Court, Wilkes County. The report

STATE v. MORROW

[200 N.C. App. 123 (2009)]

alleged four violations, including that defendant inexcusably missed seven scheduled sessions of his sexual abuse treatment program. On 8 January 2008, the Department of Correction ("DOC") notified defendant[1] that it would seek continuous SBM of his movements pursuant to the "bring back" provisions of N.C. Gen. Stat. § 14-208.40B.[2] The trial court held a hearing on 19 February 2008 to address both the probation violation report and SBM.

At the hearing, defendant admitted the allegations in the probation violation report. The trial court revoked his probation and activated his sentence for 11 months, with an additional 36 months of probation upon his release from prison.

Immediately following the revocation of defendant's probation, the trial court heard evidence on whether to enroll defendant in SBM. The trial court received the Sheriff's Incident/Investigation Report for the underlying crimes and the DOC's STATIC-99 Risk Factor Worksheet[3] as evidence.

---

1. The record does not contain a copy of any notice of an SBM hearing served on defendant, but he did not dispute the testimony of the probation officer that notice was personally served on 8 January 2008.

2. N.C. Gen. Stat. § 14-208.40B reads, in pertinent part,

(a) When an offender is convicted of a reportable conviction as defined by G.S. 14-208.6(4), and there has been no determination by a court on whether the offender shall be required to enroll in satellite-based monitoring, the Department shall make an initial determination on whether the offender falls into one of the categories described in G.S. 14-208.40(a).

(b) If the Department determines that the offender falls into one of the categories described in G.S. 14-208.40(a), the Department shall schedule a hearing in the court of the county in which the offender resides. The Department shall notify the offender of the Department's determination and the date of the scheduled hearing by certified mail sent to the address provided by the offender pursuant to G.S. 14-208.7. The hearing shall be scheduled no sooner than 15 days from the date the notification is mailed. Receipt of notification shall be presumed to be the date indicated by the certified mail receipt.

N.C. Gen. Stat. § 14-208.40B (2007).

3. "The STATIC-99 Risk Assessment is an actuarial instrument designed to estimate the probability of sexual and violent recidivism among male offenders who have already been convicted of at least one sexual offense against a child or non-consenting adult." N.C. Dep't of Correction Policies-Procedures, No. VII.F Sex Offender Management Interim Policy 9 (2007). The Department of Correction uses the STATIC-99 risk assessment to determine levels of supervision required for offenders. Id. The STATIC-99 factors include: (1) the age of the offender, (2) whether the offender has "ever lived with a lover for at least two years[,]" (3) non-sexual violence convictions, (4) prior sexual offense charges and convictions, (5) prior sentencing dates, (6) convictions for non-contact sex offenses, (7) any unrelated victims, (8) stranger victims, or (9) male victims.

At the hearing, defense counsel objected to SBM enrollment on the grounds that defendant was assessed as "moderate risk [while] the Statute talks about the highest possible type of supervision. He would [also] raise the . . . claim . . . of due process—ex post facto violations, and just for notice of monitoring[.]" The trial court made oral findings in open court, but no written findings, that DOC had assessed defendant as moderate risk, but because defendant "was 16 or 17 years of age, approximately 11 to 12 years older than the victim[,]" he should be given "the highest level of supervision[.]" Accordingly, the trial court ordered defendant to enroll in SBM for seven to ten years. Defendant appeals the SBM enrollment order.

## II. Standard of Review

This Court established the standard of review for SBM enrollment in *State v. Kilby*, —— N.C. App. ——, ——, 679 S.E.2d 430. *Kilby* first noted that the trial court is statutorily required to make findings of fact to support its legal conclusions. *Id.* (citing N.C. Gen. Stat. § 14-208.40B(c) (2007)). *Kilby* further stated:

[W]e review the trial court's findings of fact to determine whether they are supported by competent record evidence, and we review the trial court's conclusions of law for legal accuracy and to ensure that those conclusions reflect a correct application of law to the facts found. We [then] review the trial court's order to ensure that the determination that defendant requires the highest possible level of supervision and monitoring reflects a correct application of law to the facts found.

—— N.C. App. at ——, 679 S.E.2d at 432 (citations, quotation marks and brackets in original omitted).

## III. Findings of Fact

Defendant does not dispute either of the trial court's findings at the SBM hearing: (1) that he was assessed at moderate risk by the DOC and (2) that he was eleven or twelve years older than the victim. Therefore, they are "presumed to be supported by competent evidence and [are] binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991) (citations omitted).

## IV. Constitutional Issues

Defendant contends that the SBM enrollment statutory scheme (1) violates the *Ex Post Facto* Clause because it increases the punishment for a crime after the crime is committed and (2) violates the

Due Process Clause because the statute (i) is void for vagueness and (ii) does not provide a defendant with notice and opportunity to be heard. We disagree.

A. *Ex Post Facto* Clause

[1] Defendant argues that because "mandatory GPS monitoring did not exist" on the date he committed the underlying offense, the SBM statute violated the *Ex Post Facto* Clause of the United States Constitution by increasing his permissible punishment after the offense was committed. However, this Court carefully considered and overruled an identical challenge to the SBM statute in *State v. Bare*, —— N.C. App. ——, ——, 677 S.E.2d 518, 531 (2009). *Bare* controls the instant case and we therefore overrule this argument. *Id.*

We recognize, as noted by the dissent, that there may be serious legal issues raised by the DOC's manner of execution of SBM under some provisions of the N.C. Department of Correction Policies-Procedures, No. VII.F Sex Offender Management Interim Policy (2007) ("Interim Policy"). However, just as in *Bare*, —— N.C. App. ——, 677 S.E.2d 518, those issues regarding the execution of SBM have not been raised by either party in this case and our record contains no evidence, and certainly no findings by the trial court, as to the Interim Policy or details of SBM as applied to defendant. Defendant has challenged the constitutionality of the statute under which he was ordered to enroll in SBM, N.C. Gen. Stat. § 14-208.40B; defendant has not challenged the Interim Policy. Pursuant to our record, neither defendant nor the State mentioned the Interim Policy before the trial court or in their briefs. Although this Court may have the ability to take judicial notice of the Interim Policy, we have not had the benefit of briefing and arguments regarding the Interim Policy. For these reasons, we have addressed only the issues presented to us in this case, based upon the arguments and record presented in this case.

B. Void for Vagueness

[2] Defendant argues that the SBM statutory enrollment scheme is constitutionally void because it is too vague to be interpreted and administered uniformly. However, defendant did not raise a void for vagueness challenge to the trial court. "Appellate courts will not ordinarily pass upon a constitutional question unless it affirmatively appears that such question was raised and passed upon in the trial court." *State v. Cumber*, 280 N.C. 127, 131-32, 185 S.E.2d 141, 144 (1971). Accordingly, we dismiss this argument.

· C. Lack of Notice and Opportunity to Be Heard

**[3]** Defendant argues that "the satellite-based monitoring statute is unconstitutional because it does not give an offender notice and an opportunity to be heard on whether he should be monitored." Defendant further argues that the statute is unconstitutional because "under the 'bring back' statute . . . the offender [is not] entitled to be represented by counsel or to present evidence in his own defense."

The State's evidence that defendant was personally served with notice on 8 January 2008 was undisputed at the hearing. Service of notice was more than a month before defendant's 19 February 2008 hearing; fifteen days is the minimum required notice under the statute. N.C. Gen. Stat. § 14-208.40B(b) (2007) ("The hearing shall be scheduled no sooner than 15 days from the date the notification is mailed."). Furthermore, defendant was represented by counsel[4] at the SBM hearing *sub judice*. Because defendant received timely notice of the hearing and was represented by an attorney at the SBM hearing, we need not address these arguments. *See* N.C. Gen. Stat. § 1-271 (2007) (allowing appeal only by an aggrieved party); *Culton v. Culton*, 327 N.C. 624, 625-26, 398 S.E.2d 323, 324-25 (1990) (citing N.C. Gen. Stat. § 1-271 as grounds for dismissing appeal when appellant had not been "directly and injuriously affected" by an order of the court).

**[4]** Defendant also argues that "[t]he monitoring statutes, G.S. § 14-208.40A and 40B, do not put an offender on notice of what facts will require him to be monitored. . . . Thus, an offender goes into the hearing with absolutely no idea of the basis upon which the decision to require monitoring will be made." In support, defendant cites *State v. Battle*, 136 N.C. App. 781, 525 S.E.2d 850 (2000). *Battle* does not avail for defendant.

In *Battle*, "defendant attempted several times to make [a] motion to suppress[.]" 136 N.C. App. at 786, 525 S.E.2d at 853. However, the trial court "barely allowed defendant to state his motion and denied *defendant any opportunity to state his grounds or present evidence* in support of his motion." *Id.* at 787, 525 S.E.2d at 854. Accordingly, this Court granted a new trial, holding that due process required the defendant be given "an opportunity to offer evidence and present his version of the" events in question. *Id.* at 786, 525 S.E.2d at 854.

---

4. Defendant sought to minimize this very obvious flaw in his argument by mentioning in a footnote that "[t]he fact that the defendant in this case did have counsel was serendipitous; counsel was already there to represent the defendant on the probation revocation."

This case is distinguishable from *Battle*, because defendant did not attempt to introduce any evidence at the SBM hearing. Even though the SBM enrollment statutory scheme expressly gives a defendant the right "to present to the court any evidence that the [State's] evidence [pertaining to a defendant's risk assessment] is not correct[,]" N.C. Gen. Stat. § 14-208.40A(a) (2007), defendant did not seek to refute the State's evidence or attempt to offer any other evidence. It is well settled that a party who does not attempt to offer evidence for the trial court's determination of its admissibility has no basis for appeal. *Kor Xiong v. Marks*, —— N.C. App. ——, ——, 668 S.E.2d 594, 597 (2008). Accordingly, this argument is dismissed.

Though we dismiss this argument, we do note that a sex offender should have some idea of what evidence the DOC would introduce at an SBM hearing by referring to the statutes creating the SBM program. One of the SBM statutes requires "[t]he Department of Correction . . . [to] create guidelines to govern the [SBM] program." N.C. Gen. Stat. § 14-208.40 (2007). A separate statute further requires that DOC regulations "shall be filed with and published by the office of the Attorney General and shall be made available by the Department for public inspection." N.C. Gen. Stat. § 143B-261.1 (2007).

These DOC guidelines, created pursuant to N.C. Gen. Stat. § 14-208.40, are contained in the Interim Policy, which refers for example, to the Static-99 risk factors outlined in footnote 3 *supra*. The Interim Policy additionally refers to dynamic, or changeable, risk factors which "include, but are not limited to, substance abuse, poor family relations, access to victims, resistance to treatment, anger issues, residence instability, or antisocial personality." N.C. Dep't of Correction Policies-Procedures, No. VII.F Sex Offender Management Interim Policy 9 (2007). An offender may also be determined to be high risk based on factors which "override" the STATIC-99, including that the offender is "[c]linically diagnosed as a pedophile according to the DSM-IV[, in] [w]illful noncompliance with treatment[,]" or has been "[c]harged with a new sex offense." *Id.* These are all examples of types of evidence which might be presented by the DOC at an SBM hearing.

## V. Adequacy of Factual Support for the Conclusions of Law

**[5]** Defendant argues that the trial court's two findings, the DOC's "moderate" risk assessment and the ages of defendant and his victim at the time of the underlying offense do not adequately support the legal conclusion that defendant must enroll in SBM for seven to ten

years. Defendant argues that "a DOC finding of 'high risk' is . . . . a necessary prerequisite to monitoring." Defendant further argues that because the DOC assessed him at moderate risk, the trial court had no factual basis for requiring the highest possible level of monitoring. The State argues that the trial court is not limited to the DOC risk assessment but "is duty-bound to consider all relevant evidence on the issue of whether Defendant is subject to SBM and requires the highest possible level of monitoring."

The statutory text in question reads:

Upon receipt of a risk assessment from the Department, the court shall determine whether, based on the Department's risk assessment, the offender requires the highest possible level of supervision and monitoring. If the court determines that the offender does require the highest possible level of supervision and monitoring, the court shall order the offender to enroll in a satellite-based monitoring program for a period of time to be specified by the court.

N.C. Gen. Stat. § 14-208.40B(c).

"Under the canons of statutory construction, the cardinal principle is to ensure accomplishment of the legislative intent. To that end, we must consider the language of the statute, the spirit of the act and what the act seeks to accomplish." *Polaroid Corp. v. Offerman*, 349 N.C. 290, 297, 507 S.E.2d 284, 290 (1998) (citations, quotation marks and ellipses omitted), *cert. denied*, 526 U.S. 1098, 143 L. Ed. 2d 671 (1999), *abrogated on other grounds by Lenox, Inc. v. Tolson*, 353 N.C. 659, 663-64, 548 S.E.2d 513, 516-17 (2001). "[W]e first look to the words chosen by the legislature and 'if they are clear and unambiguous within the context of the statute, they are to be given their plain and ordinary meanings.' " *Fix v. City of Eden*, 175 N.C. App. 1, 19, 622 S.E.2d 647, 658 (2005) (quoting *Brown v. Flowe*, 349 N.C. 520, 522, 507 S.E.2d 894, 896 (1998)). "[W]here the words of a statute are plain, direct and unambiguous, no interpretation is needed to ascertain their meaning." *In re Duckett*, 271 N.C. 430, 436, 156 S.E.2d 838, 844 (1967) (quoting *Mook v. City of Lincoln*, 146 Neb. 779, [781,] 21 N.W.2d 743, [744 (1946)].

The plain words of the statute *sub judice* that "the court shall determine whether, based on the Department's risk assessment, the offender requires the highest possible level of supervision and monitoring[,]" N.C. Gen. Stat. § 14-208.40B(c), are not entirely "clear and

unambigious[,]" *Fix* at 19, 622 S.E.2d at 658. As noted in *Kilby*, "N.C. Gen. Stat. § 14-208.40B provides no specific legal principles which define when 'the highest possible level of supervision and monitoring' must be required." —— N.C. App. ——, ——, 679 S.E.2d 430, 432. In addition, "[t]he 'highest possible level of supervision and monitoring' simply refers to SBM, as the statute provides only for SBM and does not provide for any lesser levels or forms of supervision or monitoring of a sex offender. If SBM is imposed, the only remaining variable to be determined by the court is the duration of the SBM." *Id.* —— at —— n.2, 679 S.E.2d at 432 n.2. Therefore, we must construe the statute according to well established principles of statutory construction.

"When the plain language of a statute proves unrevealing, a court may look to other indicia of legislative will, including: the purposes appearing from the statute taken as a whole, . . . the end to be accomplished, . . . and other like means." *In re Proposed Assessments v. Jefferson-Pilot Life Ins. Co.*, 161 N.C. App. 558, 560, 589 S.E.2d 179, 181 (2003) (citation, quotation marks and brackets omitted). This Court also "look[s] . . . to our prior interpretations of the [entire] statutory framework." *Fix* at 19, 622 S.E.2d at 658.

To interpret the statute and determine the evidence which could be admitted in an SBM proceeding, we begin with the clear legislative purpose of the SBM statutory scheme, which is "to supervise certain offenders whom the legislature has identified as posing a particular risk to society." *Bare*, —— N.C. App. at ——, 677 S.E.2d at 530. Therefore any proffered and otherwise admissible evidence relevant to the risk posed by a defendant should be heard by the trial court; the trial court is not limited to the DOC's risk assessment. *See* N.C. Gen. Stat. § 8C-1, Rule 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly or by these rules.")

If the General Assembly had meant for the DOC's assessment of "high risk" to be a necessary prerequisite to the trial court's SBM determination, it could have said so, but instead, it places override authority with the trial court with the words "[i]f the trial court determines . . . ." N.C. Gen. Stat. § 14-208.40B(c). Furthermore, such a broad grant of power to the DOC, to alone determine if the offender requires "the highest possible level of supervision and monitoring" would have been an unconstitutional delegation of legislative authority by the General Assembly. *See Harvell v. Scheidt, Comr. of Motor Vehicles*, 249 N.C. 699, 702, 107 S.E.2d 549, 551 (1959) (holding that

legislative grant of authority to the Department of Motor Vehicles to define the meaning of "habitual violator" and to suspend the driver's license of a "habitual violator of the traffic laws" without a preliminary hearing was an unconstitutional delegation of legislative authority); *State v. Harris*, 216 N.C. 746, 754, 6 S.E.2d 854, 860 (1940) (declaring unconstitutional on the grounds of improper delegation of legislative responsibilities a statute granting an administrative agency unlimited discretion to set licensing requirements for dry cleaners). Construing the risk assessment provision of the SBM statutes as a constitutionally infirm delegation of legislative authority would violate the principle that "[t]his Court presumes that any act promulgated by the General Assembly is constitutional and resolves all doubt in favor of its constitutionality." *Guilford Co. Bd. of Education v. Guilford Co. Bd. of Elections*, 110 N.C. App. 506, 511, 430 S.E.2d 681, 684 (1993). Accordingly, we decline to adopt defendant's proposed construction of the statute that would requires a DOC rating of high risk as a necessary prerequisite to SBM.

Even though we do not agree with defendant's construction of the statute, our review requires us to consider whether evidence was presented which could support findings of fact leading to a conclusion that "the defendant requires the highest possible level of supervision and monitoring." N.C. Gen. Stat. § 14-208.40B(c). If "the State presented no evidence which would tend to support a determination of a higher level of risk than the "moderate" rating assigned by the DOC[,]" then the order requiring defendant to enroll in SBM should be reversed. *Kilby*, —— N.C. App. at ——, 679 S.E.2d at 434. However, if evidence supporting the trial court's determination of a higher level of risk is "presented, it [is] . . . proper to remand this case to the trial court to consider the evidence and make additional findings[.]" *Id.*

This case is distinguishable from our recent decision in *Kilby* where we reversed the SBM enrollment order when "the State presented *no evidence* which . . . tend[ed] to support a determination of a higher level of risk than the 'moderate' rating assigned by the DOC." *Id.* (emphasis added). In fact, all of the evidence in *Kilby* presented alongside the DOC's risk assessment indicated that the "defendant was fully cooperating with his post release supervision, which might support a finding of a lower risk level, but not a higher one." *Id.* Accordingly, *Kilby* reasoned that "[t]he findings of fact [were] insufficient to support the trial court's conclusion that 'defendant requires the highest possible level of supervision and monitoring' based upon a 'moderate' risk assessment from the DOC" and reversed. *Id.*

In contrast, in the case *sub judice,* in the probation revocation hearing which immediately preceded the SBM hearing, defendant admitted that he inexcusably failed to attend at least seven sessions of a sexual abuse treatment program required as a condition of his probation. This is evidence which could support a finding of higher risk. *See McKune v. Lile,* 536 U.S. 24, 33, 153 L. Ed. 2d 47, 57 (2002) (noting that an untreated sex offender is significantly more likely to reoffend than if treated). While we appreciate the difference between the probation revocation hearing and the SBM hearing, we cannot ignore the fact that less than two hours before ordering defendant to enroll in SBM the trial court had relevant and persuasive evidence before it as to defendant's risk to the public; this evidence is also a part of the record before this court. Accordingly, we remand to the trial court for additional evidentiary proceedings and more thorough findings of fact as to the level of defendant's risk.

## VI. Unspecified Time for Monitoring

[6] Defendant also argues that the trial court erred by ordering him to enroll in SBM for an indefinite period of time, seven to ten years. Defendant argues that "[i]t is not clear whether the defendant is subject to ten years of monitoring, which could somehow be reduced to seven, or is subject to seven years of monitoring, which DOC could somehow lengthen to ten." This appears to be an issue of first impression for this Court.

The plain language of the applicable statute leaves the determination of a defendant's enrollment in SBM "to be *specified* by the court." N.C. Gen. Stat. § 14-208.40B(c) (emphasis added). However, we find no statute or regulation which provides for any procedure for defendant to seek termination of his monitoring after seven years, but prior to ten years. Pursuant to N.C. Gen. Stat. § 14-208.43, offenders who are required to enroll in lifetime SBM under N.C. Gen. Stat. § 14-208.40(a)(1) may file a request with the Post-Release Supervision and Parole Commission requesting termination of SBM under certain conditions, but there is no statutory provision for termination of SBM of offenders, like defendant herein, who are enrolled under N.C. Gen. Stat. § 14-208.40(a)(2).[5] In the absence of any statutory provisions to determine when an offender's monitoring would end if his "period of time" is a range of time, we conclude that N.C. Gen. Stat.

---

5. N.C. Gen. Stat. § 14-208.43(e) states that "The Commission shall not consider any request to terminate a monitoring requirement except as provided by this section. The Commission has no authority to consider or terminate a monitoring requirement for an offender described in G.S. 14-208.40(a)(2)." N.C. Gen. Stat. § 14-208.43(e) (2007).

§ 14-208.40B(c) requires the trial court to set a definite time period for defendant's enrollment in SBM. We therefore remand to the trial court with the direction that if the trial court determines pursuant to Part V *supra,* that defendant "requires the highest possible level of supervision and monitoring" per N.C. Gen. Stat. § 14-208.40B(c), the trial court shall also set a definite period of time for defendant to be enrolled in SBM.

## VII. Conclusion

We remand the trial court order requiring defendant to enroll in SBM for further findings of fact regarding whether defendant "requires the highest possible level of supervision and monitoring[,] and if so, for the trial court to determine a definite time period for which defendant should be required to enroll in SBM.

Remanded.

Judge CALABRIA concurs.

Judge ELMORE concurs in part and dissents in part in a separate opinion.

ELMORE, Judge, concurring in part and dissenting in part.

I would reverse the order enrolling defendant in the satellite-based monitoring (SBM) program because I believe that it constitutes an unconstitutional *ex post facto* punishment and, for the following reasons, I respectfully dissent from those parts of the majority opinion holding that, or based upon a holding that, SBM does not violate the *ex post facto* clause. However, I concur in the majority's conclusions in parts IV.B, IV.C, and VI.

Although I recognize and acknowledge that this Court addressed whether SBM violates the *ex post facto* clause several months ago in *State v. Bare,* I believe that we have the benefit of additional Department of Correction (DOC) rules and regulations in this case, which makes defendant's case distinguishable from Mr. Bare's. In *Bare,* we explained repeatedly that our conclusions were based upon the record before us and that the record could not support a contrary finding. *See, e.g.,* —— N.C. App., ——, ——, 67 S.E.2d 518, 528 (2009). I believe that the record before us now can and should support a contrary finding.

Here, we may augment the record on appeal by taking judicial notice of the DOC's "Sex Offender Management Interim Policy" (Interim Policy). "The device of judicial notice is available to an appellate court as well as a trial court[.] This Court has recognized in the past that important public documents will be judicially noticed. *Utilities Comm. v. Southern Bell Telephone Company*, 289 N.C. 286, 288, 221 S.E.2d 322, 323 (1976) (quotations and citations omitted); *see also State v. R.R.*, 141 N.C. 846, 855, 54 S.E. 294, 297 (1906) ("Rules and regulations of one of the departments established in accordance with a statute have the force of law, and the courts take judicial notice of them[.]") (quotations and citations omitted). N.C. Gen. Stat. § 14-208.40 states that the DOC "shall create guidelines to govern the program," which "shall be designed to monitor two categories of offenders" and requires "that any offender who is enrolled in the satellite-based program submit to an active continuous satellite-based monitoring program, unless an active program will not work . . . ." N.C. Gen. Stat. § 14-208.40(a)-(b) (2007). There are no published regulations detailing the SBM guidelines because the DOC is exempt from the uniform system of administrative rulemaking set out in Article 2A of the Administrative Procedures Act "with respect to matters relating solely to persons in its custody or under its supervision, including prisoners, probationers, and parolees." N.C. Gen. Stat. § 150B-1(d)(6) (2007).[6] Instead, the DOC "shall adopt rules and regulations related to the conduct, supervision, rights and privileges of persons. . . . Such rules and regulations shall be filed with and published by the office of the Attorney General and shall be made available by the Department for public inspection." N.C. Gen. Stat. § 143B-261.1 (2007). The 2007 interim policy is such a rule or regulation and it is the sort of public document of which this Court may take judicial notice. *See Lutz Industries, Inc. v. Dixie Home Stores*, 242 N.C. 332, 337, 341-42, 88 S.E.2d 333, 337, 340 (1955) (taking judicial notice of the North Carolina Building Code even though "the briefs of the parties make no reference to" it because its creation and adoption was required by statute and thus had the "force and effect of law"); *W. R. Company v. Property Tax Comm.*, 48 N.C. App. 245, 261, 269 S.E.2d 636, 645 (1980) (stating that we may take judicial notice of a corporate charter on file with the Secretary of State but not included by either party in the record on appeal); *Byrd v. Wilkins*, 69 N.C. App. 516, 518-19, 317 S.E.2d 108, 109 (1984) (taking

---

6. From the existence of the Interim Policy, I assume, without articulating a legal opinion on the matter, that the DOC treats offenders subject to satellite-based monitoring as persons "under its supervision."

judicial notice of a Commission for Health Services "regulation on the procedure to be followed in administering breathalyzer tests"); *see also Wells v. Consolidated Jud'l Ret. Sys. of N.C.*, 354 N.C. 313, 319-20, 553 S.E.2d 877, 881 (2001) ("When the legislature chooses not to amend a statutory provision that has been interpreted in a specific way, we assume it is satisfied with the administrative interpretation."). Our opinions in *Bare* and its progeny make no mention of the DOC's Interim Policy and, thus, in my opinion, the application of the Interim Policy is unique to defendant's appeal.

## A. Ex Post Facto Punishment

I respectfully disagree with the majority's conclusion that SBM has no punitive purpose or effect and thus does not violate the *ex post facto* clause. To determine whether a statute is penal or regulatory in character, a court examines the following seven factors, known as the *Mendoza-Martinez* factors:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 9 L. Ed. 2d 644, 661 (1963) (footnotes and citations omitted). Although these factors "may often point in different directions[, a]bsent conclusive evidence of [legislative] intent as to the penal nature of a statute, these factors must be considered in relation to the statute on its face." *Id.* at 169, 9 L. Ed. 2d at 661. Because I believe that *Bare* is determinative as to the question of whether there is conclusive evidence that the legislature intended the SBM statute to be penal, I begin my analysis by examining the seven *Mendoza-Martinez* factors.

**1. Affirmative disability or restraint.** The first question is "[w]hether the sanction involves an affirmative disability or restraint." *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 661 (footnote and citations omitted). To echo the Supreme Court of Indiana, "[t]he short answer is that the Act imposes significant affirmative obligations and a severe stigma on every person to whom

it applies." *Wallace v. Indiana*, 905 N.E.2d 371, 661 (Ind. 2009). Both the SBM statutory provisions and its implementing guidelines require affirmative and intrusive post-discharge conduct under threat of prosecution.

In addition to the regular sex offender registration program requirements, which, though judicially determined to be non-punitive, are nevertheless significant in practice, SBM participants are subject to the following additional affirmative disabilities or restraints: (1) The DOC has "the authority to have contact with the offender at the offender's residence or to require the offender to appear at a specific location as needed[.]" N.C. Gen. Stat. § 14-208.42 (2007). (2) "The offender *shall* cooperate with the [DOC] and the requirements of the satellite-based monitoring program[.]" *Id.* (emphasis added). (3) An offender cannot leave the state of North Carolina. *Sex Offender Management Interim Policy* 16 (effective 1 January 2007). (4) An offender is subject to unannounced warrantless searches of his residence every ninety days. *Id.* at 12. (5) An offender must maintain a daily schedule and curfew as established by his DOC case manager. An offender's schedule and curfew includes spending at least six hours each day at his residence in order to charge his portable tracking device. *Id.* at 15. (6) "If the offender has an active religious affiliation," the offender's case manager must "notify church officials of the offender's criminal history and supervision conditions[.]" *Id.* at 12.

Clearly, the SBM program imposes affirmative and intrusive post-discharge conduct upon an offender long after he has completed his sentence, his parole, his probation, and his regular post-release supervision; these restraints continue forever. Of particular note is the prohibition against leaving the state. As the U.S. Supreme Court has repeated,

> The word "travel" is not found in the text of the Constitution. Yet the constitutional right to travel from one State to another is firmly embedded in our jurisprudence. Indeed, as Justice Stewart reminded us in *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969), the right is so important that it is "assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all." *Id.*, at 643 (concurring opinion).

*Saenz v. Roe*, 526 U.S. 489, 498, 143 L. Ed. 2d 689, 701 (1999) (additional quotations and citations omitted). The government may only

interfere with a citizen's right to interstate travel if it can show that such interference "is necessary to promote a compelling governmental interest[.]" *Id.* at 499, 143 L. Ed. 2d at 702 (quotations and citation omitted). Otherwise, the government risks violating the Equal Protection clause. *Id.* Depriving an offender of his right to interstate travel is, without question, an affirmative disability or restraint.

Though some may argue that the remaining restrictions are mere inconveniences, this would be a deceiving understatement. Although offenders are no longer subject to formal probation, the requirements that they are subject to are equally intrusive: they cannot leave the state, they cannot spend nights away from their homes, they are subject to schedules and curfews, they must appear on command, and they must submit to all DOC requests and warrantless searches. An offender's freedom is as restricted by the SBM requirements as by the regular conditions of probation, which include: remaining in the jurisdiction unless the court or a probation officer grants written permission to leave, reporting to a probation officer as directed, permitting the probation officer to visit at reasonable times, answering all reasonable inquiries by the probation officer, and notifying the probation officer of any change in address or employment. In addition, submission to warrantless searches is not a regular condition of probation and is instead a special condition of probation.

Accordingly, I believe that SBM imposes an affirmative disability or restraint upon defendant, which weighs in favor of the SBM statute being punitive rather than regulatory.

**2. Sanctions that have historically been considered punishment.** The next question is whether SBM "has historically been regarded as a punishment." *Mendoza v. Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 661 (footnote and citations omitted). Obviously, satellite monitoring technology is new and thus tracking offenders using the technology is not a historical or traditional punishment. However, the additional restrictions imposed upon offenders are considered punishments, both historical and current. In addition, some courts have suggested that the SBM units, made up of an ankle bracelet and a miniature tracking device (MTD), are analogous to the historical punishments of shaming. *See, e.g., Doe v. Bredeson*, 507 F.3d 998, 110 (2007) (Keith, J., concurring in part and dissenting in part), *cert. denied*, 172 L. Ed. 2d 210 (2008).

In *Bredeson*, the Sixth Circuit considered whether Tennessee's SBM statute violated the *ex post facto* clause. The *Bredeson* majority first held that the Tennessee legislature's purpose when enacting the

SBM statute was to establish a civil, nonpunitive regime. *Id.* at 1004. The majority then examined the *Mendoza-Martinez* factors and concluded, in relevant part, that Tennessee's SBM program was not a sanction historically regarded as punishment. *Id.* at 1005. It explained that the Tennessee "Registration and Monitoring Acts do not increase the length of incarceration for covered sex offenders, nor do they prevent them from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation." *Id.* Judge Keith, in his dissent, characterized the GPS monitoring system as a "catalyst for ridicule" because the defendant's monitoring device was "visible to the public when worn" and had to "be worn everywhere" the defendant went. *Id.* at 1010 (Keith, J., dissenting in part and concurring in part). "Public shaming, humiliation, and banishment are well-recognized historical forms of punishments." *Id.* (citations omitted). It is clear from the DOC guidelines and maintenance agreements that the MTD must be worn on the outside of all clothing and cannot be concealed or camouflaged in any way, even though some forms of concealment or camouflage would not interfere with the LTD's function. In addition, an offender's religious institution must be informed of his status and his SBM compliance requirements. I agree with Judge Keith that the SBM scheme is reminiscent of historical shaming punishments, which weighs in favor of finding the scheme punitive, rather than regulatory.

**3. Finding of scienter.** The next question is whether the statute "comes into play only on a finding of *scienter.*" *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 661 (footnote and citations omitted). I believe that this factor is met because the underlying criminal acts, indecent liberties with a child and third degree sexual exploitation of a minor, require intentional conduct. *State v. Beckham*, 148 N.C. App. 282, 286 558 S.E.2d 255, 258 (2002) (citation omitted); *see* N.C. Gen. Stat. § 14-202.1(a) (2007) ("A person is guilty of taking indecent liberties with children if, being 16 years of age or more and at least five years older than the child in question, he either: (1) *Willfully* takes or attempts to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years for the purpose of arousing or gratifying sexual desire; or (2) *Willfully* commits or attempts to commit any lewd or lascivious act upon or with the body or any part or member of the body of any child of either sex under the age of 16 years.") (emphases added); N.C. Gen. Stat. § 14-190.17A(a) (2007) ("A person commits the offense of third degree sexual exploitation of a minor if, *knowing* the character or content of the material, he possesses material that contains

a visual representation of a minor engaging in sexual activity.")
(emphasis added).

**4. Traditional aims of punishment.** The next question is
"whether the sanction promotes the 'traditional aims of punish-
ment—retribution and deterrence.' " *Beckham*, 148 N.C. App. at 286,
558 S.E.2d at 258 (quoting M*endoza-Martinez*, 372 U.S. at 168, 9
L. Ed. 2d at 661). Without question, the sanction promotes deter-
rence. For example, offenders are restricted in their movements,
ostensibly in part to prevent them from venturing into schoolyards or
nurseries; when satellite-monitored offenders venture into these
restricted zones, their supervisors are notified and the offender may
be charged with a felony. Although "the mere presence of a [deterrent
quality] is insufficient to render a sanction criminal [because] deter-
rence may serve civil, as well as criminal goals," *Hudson v. United
States*, 522 U.S. 93, 105, 139 L. Ed. 2d 450, 463 (1997) (quotations and
citation omitted), the deterrent effect here is substantial and not
merely incidental. Accordingly, it weighs in favor of finding the sanc-
tion to be punitive.

**5. Applicability only to criminal behavior.** The next question
is "whether the behavior to which [the] statute applies is already a
crime." *Mendoza-Martinez*, 372 U.S. at 168, 9 L. Ed. 2d at 567 (foot-
note and citation omitted). The SBM statute applies only to people
who have been convicted of "reportable offenses." Thus, this factor
weighs in favor of finding the sanction to be punitive.

**6. Advancing non-punitive interest.** The next question is
"whether an alternative purpose to which [the statute] may rationally
be connected is assignable for it[.]" *Id.* at 168-69, 9 L. Ed. 2d at 567
(footnote and citation omitted). The SBM statute does advance a
rationally related non-punitive interest, which is to keep law enforce-
ment officers informed of certain offenders' whereabouts in order to
protect the public. Preventing further victimization by recidivists is a
worthy non-punitive interest and one that weighs in favor of finding
the sanction to be regulatory.

**7. Excessiveness in relation to State's articulated pur-
pose.** The final question is "whether [the statute] appears excessive
in relation to the alternative purpose assigned" to it. *Id.* at 169, 9
L. Ed. 2d at 568 (footnote and citation omitted). "The excessive-
ness inquiry . . . is not an exercise in determining whether the legis-
lature has made the best choice possible to address the problem it
seeks to remedy. The question is whether the regulatory means

chosen are reasonable in light of the nonpunitive objective." *Smith v. Doe*, 538 U.S. at 105, 155 L. Ed. 2d at 185. Judge Keith, dissenting from the majority opinion in *Bredeson*, explained SBM's excessiveness as follows:

> I fail to see how putting all persons in public places on alert as to the presence of offenders, like Doe, helps law enforcement officers geographically link offenders to new crimes or release them from ongoing investigations. It equally eludes me as to how the satellite-based monitoring program prevents offenders, like Doe, from committing a new crime. Although the device is obvious, it cannot physically prevent an offender from re-offending. Granted, it may help law enforcement officers track the offender (after the crime has already been committed), but it does not serve the intended purpose of public safety because neither the device, nor the monitoring, serve as actual preventative measures. Likewise, it is puzzling how the regulatory means of requiring the wearing of this plainly visible device fosters rehabilitation. To the contrary, and as the reflection above denotes, a public sighting of the modern day "scarlet letter"—the relatively large G.P.S. device—will undoubtedly cause panic, assaults, harassment, and humiliation. Of course, a state may improve the methods it uses to promote public safety and prevent sexual offenses, but requiring Doe to wear a visible device for the purpose of the satellite-based monitoring program is not a regulatory means that is reasonable with respect to its nonpunitive purpose.

> Sexual offenses unquestionably rank amongst the most despicable crimes, and the government should take measures to protect the public and stop sexual offenders from re-offending. However, to allow the placement of a large, plainly obvious G.P.S. monitoring device on Doe that monitors his every move, is dangerously close to having a law enforcement officer openly escorting him to every place he chooses to visit for all (the general public) to see, but without the ability to prevent him from re-offending. As this is clearly excessive, this factor weighs in favor of finding the Surveillance Act's satellite-based monitoring program punitive.

*Bredesen*, 507 F.3d at 1012 (Keith, J., dissenting). I agree with Judge Keith's assessment; the restrictions imposed upon defendant by the SBM statute are dangerously close to supervised probation if not personal accompaniment by a DOC officer. The *Bredeson* majority dismissed Justice Keith's concerns about the device's visibility by stating

its "belie[f] that the dimensions of the system, while not presently conspicuous, will only become smaller and less cumbersome as technology progresses." *Id.* at 1005. Smaller, less conspicuous, and less cumbersome technologies already exist, but implementation of new technologies is expensive and time-consuming. Though we may one day be able to tag and release a recidivist sex offender as though he were a migrating songbird, it is not a practical reality for defendant at this time or in the immediate future. The SBM equipment and accompanying restrictions as they *exist now* support a conclusion that SBM is a punishment.

In sum, of the seven factors specifically identified by the U.S. Supreme Court in *Mendoza-Martinez* as relevant to the inquiry of whether a statute has a punitive effect despite legislative intent to the contrary, I believe that six factors point in favor of treating the SBM provisions as punitive. Only one—that the statute advances a non-punitive purpose—points in favor of treating the SBM provisions as non-punitive. Accordingly, I would hold that defendant's enrollment in the SBM program constitutes a punishment.

Accordingly, I would also hold that defendant's enrollment in the SBM program constitutes an unconstitutional *ex post facto* punishment and would reverse the order enrolling him in the program.